## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

MARK WILLIAMS,         )
         )
    **Plaintiff,**       )
         )
  **v.**          )    **Case number 4:04cv1049 TCM**
         )
JO ANNE B. BARNHART,    )
Commissioner of Social Security,  )
         )
    **Defendant.**     )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying Mark Williams' applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b. Mr. Williams ("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Citing an inability to work after January 1, 1998, Plaintiff applied in May 2002 for DIB and SSI. (R. at 30-34, 68-70.[2]) The cause of his disability was a degenerative joint and

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties. <u>See</u> 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

disc disease in his back, feet, and knees. (<u>Id.</u> at 101, 125.) He later amended his applications to allege a disability onset date of April 1, 2001. (<u>Id.</u> at 42.) His applications were denied initially and after a hearing held before Administrative Law Judge ("ALJ") James E. Seiler in July 2003. (<u>Id.</u> at 14-21, 35, 54-58.) The Appeals Council denied Plaintiff's request for review of the ALJ's adverse decision, effectively adopting that decision as the final decision of the Commissioner. (<u>Id.</u> at 3-6.)

## <u>Testimony Before the ALJ</u>

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing. His wife, Laurie Williams, was present but did not testify.

Plaintiff testified he was born on October 22, 1958, and was then 44 years old. (<u>Id.</u> at 191.) He was 5 feet 7 inches tall and weighed 188 pounds. (<u>Id.</u>) He was right-handed. (<u>Id.</u>) He had completed the ninth grade, and had not received any special education. (<u>Id.</u> at 191-92.) He lived with his wife and eight-year old daughter in a house. (<u>Id.</u> at 191.) His wife did not work. (<u>Id.</u> at 200.) They do not own the house, but live there rent-free. (<u>Id.</u> at 200-01.)

Plaintiff last worked in 2002 doing some farm maintenance. (<u>Id.</u> at 192.) He had been doing that type for work for five years, but had to quit because of problems with his lower back, neck, and knees. (<u>Id.</u>) Stooping, walking, or kneeling caused pain in his knees. (<u>Id.</u>) He could walk no farther than 100 yards. (<u>Id.</u>) To relieve the pain, he lies down on a couch, moves his knees back and forth, rubs ointment on them, or takes pain relievers, either Darvocet, Flexeril, or Vioxx. (<u>Id.</u> at 193.) He also has severe pain in his lower back.

(Id.)  This pain is caused by any type of lifting, stooping, reaching, bending, standing, and walking.  (Id.)  Additionally, sitting causes an aching pain.  (Id. at 193-94.)  He could not sit for longer than 30 minutes before having to move; he could not stand for longer than 20 minutes; and he could not walk for longer than 15 minutes.  (Id. at 194.)  He has pain in his neck that is aggravated if he looks up or down.  (Id. at 194-95.)  A warm compress or pain reliever helps alleviate the pain.  (Id. at 195.)  He does not have any problems with his arms.  (Id. at 197.)

He takes three medications, the Darvocet, Flexeril, and Vioxx.  (Id. at 195.)  The Flexeril and Darvocet cause drowsiness and, if he takes the medications every day, stomach pains.  (Id.)

Plaintiff drives a truck once a week to do grocery shopping.  (Id. at 196.)  He has difficulty doing so, however, because the truck has a manual transmission and shifting and steering causes back, neck, shoulder, and knee pain.  (Id.)  Plaintiff does not visit friends or relatives; they will visit him approximately once a month.  (Id. at 197.)  He does not attend church or any other social gathering.  (Id.)  He generally does not have any problems with his personal grooming, with the exception of putting his shoes on, tying them, or shaving.  (Id. at 197-98.)  He does not read very well.  (Id. at 198.)  He does not engage in any outdoor activity and does not do any work around the house.  (Id. at 198-99.)  His wife cuts the grass.  (Id. at 202.)  He watches television.  (Id. at 198.)  On a typical day, he gets up at 5:30 in the morning, watches television, spends time talking with his daughter, and watches her play.  (Id. at 199.)  He tries to walk for exercise.  (Id.)  He watches television in the afternoon and

sometimes watches his daughter play.  (Id.)  In the evening, he watches the evening news with his wife.  (Id.)  He takes a Flexeril to relieve his pain and falls asleep while watching television.  (Id. at 200.)  He wakes up three or four times a night with back cramps.  (Id.)

Plaintiff has had a Medicaid card for approximately two years, and has recently had to change doctors because of the Medicaid coverage.  (Id. at 202.)  He last participated in physical therapy in 1995.  (Id. at 202-03.)  His doctor has given him some exercises to do; however, he does not often do them.  (Id. at 203.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed by Plaintiff as part of the application process; documents generated pursuant to that record; medical records; and medical evaluation reports.

As part of the application process, Plaintiff completed a disability report, a work history report, a pain questionnaire, and a claimant questionnaire.

One job was listed on his work history report.  (Id. at 107-14.)  That job was a caretaker position in 1993 and 1994.  (Id. at 108.)  It required a lot of manual labor, including having to occasionally lift 100 pounds or more and frequently lift 25 pounds.  (Id.)  Another report described him as self-employed from 1988 to April 2001.  (Id. at 126.)  The claimant questionnaire was completed by a counselor after a telephone interview with Plaintiff.  (Id. at 101-04.)  Plaintiff was then taking only Celebrex, and was using the samples provided him by Dr. Crawford.  (Id. at 101.)  The Celebrex upset his stomach.  (Id.)  His wife did the grocery shopping and meal preparation.  (Id. at 102.)  He did the laundry and mowed the

grass. (Id.) This second chore he could do for only ten minutes at a time. (Id. at 102-03.) He used to enjoy hunting and fishing, but now he had to sit in a lawn chair by the river to fish. (Id. at 103.)

In the disability report, April 2001 was listed as the date Plaintiff's impairments prevented him from working. (Id. at 125.) That date was crossed out, and January 1998 was listed. (Id.) There is no date for when these impairments first bothered him. (Id.) He tried to work after that, however, by working fewer hours. (Id.) He finally stopped working in April 2001 because he had to take so many days off and could not physically handle the work. (Id.) When self-employed, the heaviest weight he had to lift was 100 pounds. (Id. at 126.) He frequently had to lift 50 pounds. (Id.) He was constantly kneeling and crouching. (Id.) He was doing hard physical labor all day long. (Id.) He saw Dr. Crawford for his back and joint pain. (Id. at 127.) Dr. Crawford had referred him to Dr. Richard Pearson. (Id.) Plaintiff had an appointment with Dr. Pearson on May 15, 2002.[3] (Id.) The eleventh grade was the highest grade he had completed. (Id. at 131.)

An earnings report generated for Plaintiff listed income in 20 of the 27 years reported. (Id. at 59.) The first year reported was 1975, when Plaintiff turned 17. (Id.) His lowest annual income was $81.37, in 1985. (Id.) He had no income for the two years prior to 1985 or the two years after. (Id.) His highest annual income was $8,043.75, in 1997. (Id.) For the last year of reported earnings, 2001, he earned $762.00. (Id.)

---

[3]As of May 21, 2002, Dr. Pearson had no record of Plaintiff.

On June 12, 2000, Plaintiff consulted Steven Crawford, D.O., about abdominal pain that become worse since beginning the week before. (Id. at 141.) Plaintiff was constipated, tired, fatigue, and without energy. (Id.) The constipation was suspected as the cause of the pain. (Id.) An x-ray of his abdomen was normal. (Id. at 139.) Four days later, Plaintiff reported that the abdominal pain was coming and going. (Id. at 142.) His fatigue had increased. (Id.) In May 2001, Plaintiff consulted Dr. Crawford about pain he was having in his left wrist. (Id. at 143.) He attributed the pain to some IV's the year before. (Id.) The right wrist also hurt, but not as badly as the left. (Id.) In December, Plaintiff reported that his back pain was getting worse. (Id. at 144.) He had fallen off a barn seven or eight years before, had been diagnosed by a neurosurgeon with lumbar strain, and had done some physical therapy. (Id.) Plaintiff was given a prescription for Celebrex and told to return in two weeks. (Id.) At his return visit in January 2002, Dr. Crawford discussed the x-ray reports of his low back with Plaintiff. (Id. at 145.) Those reports revealed a progressive degenerative joint disease. (Id.) Dr. Crawford prescribed Naprosyn. (Id.) In March, Plaintiff reported that the medication was not helping. (Id. at 146.) His back pain was worse and he was barely able to walk. (Id.) Additionally, his knees had begun to hurt when extended and he was unable to sleep because of the pain. (Id.) Flexeril was prescribed, and a referral to an orthopedist was given. (Id.)

In June 2003, Plaintiff consulted Mauro Carranza with Desoto Medical Services. (Id. at 158.) He reported that he had had a sore back, neck, and knees for one month, and had been told by Dr. Crawford that he had degenerative disc disease and degenerative joint

disease.  (Id.)  On examination, he was tender in his thoracic and lumbar spine area and his

right knee.  (Id.)  An x-ray revealed (a) osteoarthritic changes with spur formation at C6 and

C7 vertebrae with a slight narrowing of the disc space between C6-C7 and a narrowing of

the intravertebral foramina at C6-C7, and (b) minimal osteoarthritis and spur formation at

L5 vertebra with a slight narrowing of the disc space between L5-S1.  (Id. at 156-57.)

Flexeril and Darvocet were prescribed.  (Id. at 158.)   Dr. Carranza also recommended an

application of heat when first awake and predicted that a neurologist might need to be

consulted.  (Id.)  Two weeks later, Plaintiff reported that the Darvocet was giving him

stomach aches.  (Id. at 162.)  He was prescribed a small dosage of Vioxx.  (Id.)  On July 10,

Plaintiff continued to be tender in his lower back.  (Id. at 161.)  Plaintiff reported that he was

having pain in both his legs and cold, aching pain in his lower back.  (Id.)  He was to be

referred to a neurologist.  (Id.)

Subsequently, on October 21,[4] Plaintiff was examined by a neurologist, Ling Xu,

M.D.  (Id. at 169-75, 177-78.)  Dr. Xu summarized Plaintiff's complaints as follows:

> He . . . has had constant but progressively worsening of lower back pain that
> radiates to the legs along with numbness in both legs.  He feels he cannot bend
> or sit for long.  He also complains of burning of the toes in the left foot
> recently.  He developed a new onset of headaches, bitemporal sharp pain,
> which last [sic] for several minutes and occurs three to four times several times
> each week and is worse with increased stress. . . .
>
> . . . He has depression and feels tired and has trouble falling asleep or awakes
> in the middle of the night.  His depression is due to money issues.  He is

---

[4]Plaintiff was first scheduled to see Dr. Xu on September 2 and then again on September 30.
He rescheduled the September 30 visit for October 21.  (Id. at 176.)

> unable to tolerate physical work.  He is otherwise healthy, except for some
> sinus drainage.  He never had headaches in the past.

(Id. at 169.)  On examination, Plaintiff appeared to be in pain.  (Id.)  He had no muscle

atrophy, motor weakness, or fasciculation (involuntary twitching) of all four extremities.

(Id.)  He had a normal gait and normal coordination.  (Id. at 170.)  He did have diminished

sensation to pinprick bilaterally at the L4-L5 dermatome, diminished range of motion in his

lumbar spine, and joint tenderness to palpation of his left big toe.  (Id.)  He had a positive

straight-leg raising test bilaterally, which was worse on the left.  (Id.)  His deep tendon

reflexes were 2+/4 bilaterally.  (Id.)  Dr. Xu opined that Plaintiff had lumbosacral

radiculopathy; vascular headaches; and big toe pain, possible due to gout.  (Id.)  He

scheduled him for several diagnostic tests and gave him a prescription for a trial course of

an anti-depressant.  (Id.)  There is no record of such tests, or of a return visit which was to

follow.

    The records before the ALJ also included the report of a consultative examination

performed in July 2002 by Victoria Allen, D.O.  (Id. at 147-48.)  Dr. Allen noted that

Plaintiff had been unable to afford medical care.  (Id. at 147.)  His medications were extra-

strength Tylenol.  (Id.)  He used to take Celebrex and it helped; however, he could no longer

afford the medication.[5]  (Id.)  On examination, he was able to flex and extend his back to 45

degrees.  (Id.)  Straight leg raises were 70 degrees sitting and supine.  (Id.)  To do so,

---

[5]The Record includes a August 9, 2002, report of contact between the counselor assigned to
Plaintiff's case and his caseworker at the Division of Family Services about Plaintiff's Medicaid status.
(Id. at 95.)  According to this report, Plaintiff was on income-based Medicaid at the highest level of
care.  (Id.)  A prescription would cost him Two Dollars.  (Id.)

Plaintiff pushed himself beyond his pain threshold.  (Id.)  He also had a decreased range of motion in his right knee to 100 degrees and in his left knee to 120 degrees.  (Id.)  There was no loss of range of motion in either hip.  (Id.)  He was able to get on and off the examining table only with difficulty.  (Id.)  He had a normal gait, without an assistive device, and normal arm swing.  (Id.)  He could bear full weight on his legs.  (Id.)  Walking on his heels caused him back pain, and he was unable to squat.  (Id.)  He was not tender to palpation in either knee, nor was there any crepitus present.  (Id.)  Dr. Allen opined that Plaintiff's lifting, pushing, and pulling should be limited to 50 pounds occasionally and 10 pounds frequently.  (Id. at 148.)  He could stand or walk at least two hours during an eight-hour workday, but must alternate sitting and standing to relieve his back pain.  (Id.)

The following month, Melinda Niswonger, a counselor with the State of Missouri's Section of Disability Determinations, completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (Id. at 82-89.)  She assessed Plaintiff's exertional limitations as being able to occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for 2 hours during an 8-hour workday, and sit for 6 hours in an 8-hour workday.  (Id. at 83.)  He had several postural limitations; specifically, he should only occasionally climb a ladder, rope, or scaffolds or stoop.  (Id. at 84.)  His only environmental limitation was the need to avoid a concentrated exposure to vibrations.  (Id. at 86.)  He had no manipulative, visual, or communicative limitations.  (Id. at 85-86.)

## The ALJ's Decision

The ALJ concluded that Plaintiff had severe impairments of knee pain and mild degenerative disc disease of the cervical and lumbar spine, but he did not have an impairment or combination of impairments listed in, or medically equal to one listed in, the regulations. (Id. at 20.)

Acknowledging that Plaintiff's description of his daily activities portrayed an individual who was significantly restricted, the ALJ found that description not to be fully credible. (Id.) The ALJ based this finding on the lack of supporting objective medical evidence, including his ability to walk normally during Dr. Xu's examination, his ability to bear weight on both legs, the lack of any muscle atrophy, and the lack of any specific knee-related diagnosis; his lack of treatment; his ability to continue working after the fall that injured his back; the recent allegation of headaches, unaccompanied by any medication or referral to a specialist; and his prior work history. (Id. at 18-19.) The ALJ noted that Plaintiff's restricted lifestyle was not the result of any physician-imposed restrictions. (Id. at 19.) The ALJ also noted that one year of SSI would be "very competitive" to Plaintiff's usual annual income when working. (Id.) Additionally, Plaintiff had never alleged any limitations created by a mental health impairment and had not sought any treatment for such. (Id. at 18.).

The ALJ next considered Plaintiff's residual functional capacity ("RFC"). (Id.) He noted that Dr. Allen had opined that Plaintiff could no longer continue his previous work as a farmer but "'may be able to have a job where he does not have to bend, stoop, kneel or lift

a heavy load.'" (Id.)  He concluded that Plaintiff had the RFC "to perform work involving primarily sitting, with only occasional standing and walking for no more than two hours in an 8-hour workday" and to lift no more than 10 pounds on a frequent basis."  (Id.)  These limitations were consistent with the requirements of sedentary[6] work.  (Id.)  They were not, however, consistent with the requirements of Plaintiff's past relevant work.  (Id. at 20.)  Considering his age, limited education, work experience, and RFC, Plaintiff could perform the full range of sedentary work.  (Id.)  Consequently, he was not disabled within the meaning of the Act.  (Id.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B).

---

[6]Sedentary work is defined as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 404.1567(b).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite

limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." **Id.** See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). And, although

- 13 -

a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir. 1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. <u>See</u> **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998). The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant. <u>See</u> **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. <u>See also</u> 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner may meet her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grids may not be relied

on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ's adverse decision is not supported by substantial evidence on the record as a whole. Specifically, the ALJ (a) failed to consider all his medically determinable impairments, including his headaches and depression; (2) failed to consider Dr. Allen's finding that he could not bend, stoop, kneel, or lift a heavy load when assessing Plaintiff's RFC; (3) improperly assessed his credibility; and (4) improperly relied on the Grids because he had a significant non-exertional impairment and, therefore, the testimony of a vocational expert ("VE") was necessary. The Commissioner disagrees.

Medical Impairments. Plaintiff correctly notes that Dr. Xu diagnosed him with vascular headaches and prescribed an anti-depressant. Plaintiff misapprehends, however, the weight to be given this diagnosis when arguing that the ALJ erred by not considering these two impairments to be severe.

"The amount of weight given to a medical opinion is to be governed by a number of factors[,] including the examining relationship, the treatment relationship, consistency, specialization, and other factors." **Shontos v. Barnhart**, 328 F.3d 418, 426 (8th Cir. 2003) (alteration added). "Generally, more weight is given to opinions of sources who have treated a claimant, and to those who are treating sources. 20 C.F.R. § 404.1527(d). The regulations provide that the longer and more frequent the contact between the treating source, the greater the weight will be given the opinion[.]" **Id.** (alteration added). Additionally, "[t]he [Commissioner] is encouraged to 'give more weight to the opinion of a specialist about medical issues related to his or her area of speciality than to the opinion of a source who is not a specialist.'" **Metz v. Shalala**, 49 F.3d 374, 377 (8th Cir. 1995) (quoting 20 C.F.R.

§ 416.927(d)(5)) (alterations added). <u>Accord</u> **Guilliams v. Barnhart**, 393 F.3d 798, 803 (8th Cir. 2005).

After his one-time examination of Plaintiff, Dr. Xu diagnosed him with vascular headaches and noted his complaint of depression. The headaches were new and connected to stress; the depression was related to Plaintiff's financial situation. Dr. Xu also scheduled Plaintiff for several tests, the results of which are not included in the record. More weight is given a medical source's opinion when that opinion is supported by medical signs and laboratory findings. <u>See</u> 20 C.F.R. § 404.1527(d)(2)(ii). Dr. Xu's diagnosis of headaches and depression was supported by neither. Nor is there any indication that Plaintiff's newly-experienced headaches would satisfy the durational requirement of 42 U.S.C. § 1382c(a)(3)(A). And, the ALJ's failure to consider Plaintiff's reported depression as a severe impairment is supported by Plaintiff's failure to allege it as such in his applications and his lack of any treatment. <u>See</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1039-40 (8th Cir. 2001) (affirming ALJ's conclusion claimant's depression was not a severe impairment based on claimant's failure to allege it in application for disability benefits, her lack of follow-through appointments for treatment, and intake notes supporting ALJ's conclusion that depression was caused by denial of aid and was situational). <u>See</u> <u>also</u> **Strongson v. Barnhart**, 361 F.3d 1066, 1070 (8th Cir. 2004) ("It is appropriate . . . to disregard statements of opinion by a treating physician that consist[s] of nothing more than vague, conclusory statements. In addition, the ALJ need not give controlling weight to a physician's RFC

assessment that is inconsistent with other substantial evidence in the record." (interim quotations omitted) (first alteration added, second in original)).

RFC. Plaintiff further argues that the ALJ erred by not including Dr. Allen's conclusion that he could not bend, kneel, stoop, or crouch in his assessment of Plaintiff's RFC. As noted above, the assessment of a claimant's RFC requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.'" **Depover**, 349 F.3d at 565 (quoting S.S.R. 96-8p). Other than Plaintiff's credibility, properly assessed for the reasons set forth below, there was no supporting evidence for Dr. Allen's conclusion that he could not bend, kneel, stoop, or crouch. There was no muscle atrophy, weakness, or spasms. He could bear his weight on both his legs. Although the ALJ accepted Dr. Allen's conclusion about Plaintiff's ability to stand, walk, and sit,[7] he was not required to accept conclusions not supported by the record.

Credibility. As noted above, when evaluating a claimant's RFC, the ALJ must consider, inter alia, the claimant's own descriptions of his limitations. **Pearsall**, 274 F.3d at 1217. Consequently, the ALJ must evaluate the claimant's credibility. **Id.** at 1218. "'Where adequately explained and supported, credibility findings are for the ALJ to make.'" **Ellis**, 392 F.3d at 996 (quoting Lowe, 226 F.3d at 972). "The ALJ need not explicitly discuss each Polaski factor." **Strongson**, 361 F.3d at 1072. "It is sufficient if he acknowledges and

---

[7]The ALJ found Plaintiff's ability to lift more restricted than described by Dr. Allen.

considers those factors before discounting a claimant's subjective complaints." **Id.** Accord **Lowe**, 226 F.3d at 972.

In the instant case, the ALJ evaluated Plaintiff's credibility and discounted it based on several Polaski factors, including the lack of supporting objective evidence. This omission is a proper consideration. See **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994) (holding that the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ also properly considered Plaintiff's failure to seek medical treatment as detracting from his credibility. See **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005); **Holley v. Massanari**, 253 F.3d 1088, 1092 (8th Cir. 2001). Plaintiff informed one health care provider in 2001 that he had injured his back seven or eight years before; thus, the injury predated the year in which he had his highest earnings. See **Dodson v. Chater**, 101 F.3d 533, 534 (8th Cir. 1996) (ALJ's findings that claimant's subjective complaints of pain were not fully credible were supported by, among other things, claimant continuing to work after onset of impairments). His poor work history was another relevant consideration. See **Hutton v. Apfel**, 175 F.3d 651, 655 (8th Cir. 1999); **Siemers v. Shalala**, 47 F.3d 299, 301 (8th Cir. 1995).

The ALJ considered the fact that Plaintiff's prospective disability benefits would be "very competitive" with his highest annual earnings. Plaintiff argues this was an improper consideration. It would be improper if this fact was considered by the ALJ to be dispositive. **Ramirez**, 292 F.3d at 581 n.4. It is not irrelevant, however, and the ALJ did not err by considering it in when assessing Plaintiff's credibility. **Id.** at 581.

Additionally, there were inconsistencies in the record. For instance, Plaintiff testified he had completed the ninth grade; on a form he listed the eleventh grade. He informed Dr. Crawford in December 2001 that his back was getting worse after he had injured it in fall seven or eight years before, yet he failed to mention back pain in his previous two visits and in June 2003 described the back pain as being of one month's duration. He also informed Dr. Crawford that he thought the source of his wrist pain was IV's, yet there is no record of any hospitalization. He sought no medical treatment for 15 months, yet when he next sought it he reported that his back pain was so bad he could barely walk. He explained in July 2002 that he could no longer afford Celebrex, yet he had been receiving Medicaid and had been forced, according to this testimony, to change doctors because of Medicaid coverage.

For the foregoing reasons, the ALJ did not err in his assessment of Plaintiff's credibility.

Application of the Grids. Plaintiff further argues that the ALJ erred by applying the Medical-Vocational Guidelines (the "Grids") because he has two nonexertional impairments, depression and headaches.

"The ALJ may not rely on the grids if [a claimant] suffers from non-exertional impairments, but instead must obtain the opinion of a vocational expert." **Ellis**, 392 F.3d at 996 (alteration added). "Non-exertional impairments that do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities do not prevent use of the grids, however." **Id.** (alteration in original) (interim quotations omitted). See also **McGeorge v. Barnhart**, 321 F.3d 766, 768-69 (8th Cir. 2003) ("[T]he law of this circuit states that an ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." (alteration added) (interim quotations omitted)).

The record supports the ALJ's conclusion that Plaintiff did not have any significant non-exertional impairments. Consequently, application of the Grids was appropriate. See **Patrick v. Barnhart**, 323 F.3d 592, 596 (8th Cir. 2003) (finding use of Grids appropriate based on ALJ's permissible discrediting of claimant's complaints of fatigue and swelling); **Howard v. Massanari**, 255 F.3d 577, 583 (8th Cir. 2001) (finding challenge to use of the Grids meritless when ALJ properly rejected argument that claimant who had undergone successful surgeries to hand and leg could not perform light work and when ALJ had taken into account those of claimant's physical problems established by the record).

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 30th day of August, 2005.